Anthony J. Dreyer
David M. Lamb
Michael C. Salik
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Tel.: (212) 735-3000

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| METACAPITAL MANAGEMENT, L.P., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 1:22-cv-07615-PKC |
| ) | |
| META PLATFORMS, INC., ) | **AMENDED COMPLAINT** |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## <u>METACAPITAL MANAGEMENT, L.P.'S AMENDED COMPLAINT</u>

Plaintiff Metacapital Management, L.P. ("Metacapital") by its attorneys, for its

Amended Complaint against Defendant Meta Platforms, Inc., f/k/a Facebook, Inc. ("Defendant"

or "Facebook"), upon personal knowledge as to its own acts and conduct and on information and

belief as to all other matters, states and alleges as follows:

### <u>INTRODUCTION</u>

1.    This is an action alleging trademark infringement in violation of Sections

32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), unfair competition in violation of

Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), common law trademark infringement, and

false advertising in violation of N.Y. Gen. Bus. Law § 350.

2.    This action concerns Facebook's blatant and willful disregard of Metacapital's longstanding trademark rights.  Since 2001, Metacapital has provided industry-leading financial management and advisory services, particularly in the mortgage and structured credit markets, under its trademarks incorporating the term "Metacapital" (the "METACAPITAL Marks").

3.    Over the past 20 years, Metacapital has earned a well-deserved reputation for its outstanding service and has been recognized in various rankings of the nation's top funds, including by Bloomberg, Barron's, and BarclayHedge, and has received numerous Absolute Return Awards.

4.    Moreover, since its inception, Metacapital has routinely and continuously used the shorthand "Meta" to refer to itself (the "META Mark"), and consumers have come to associate Metacapital and its services with the META Mark.

5.    As a consequence of its continuous, extensive, and well-publicized use of the METACAPITAL Marks and the META Mark, particularly within the financial services industry, and the substantial goodwill that Metacapital has built as a result of its outstanding service, Metacapital has acquired strong trademark rights in the METACAPITAL Marks and the META Mark.

6.    On October 28, 2021, Facebook announced that it was changing its name from Facebook, Inc.—which it had used for over 17 years—to "Meta."  Facebook had been hyping this name change for several days leading up to the announcement, and the change was announced in connection with Facebook's much-anticipated annual conference, Facebook Connect 2021.  Accordingly, the announcement was highly publicized and purposefully designed to garner maximum attention from the press and the public.

7.      Although Facebook has been largely known as a social media platform for the majority of its existence, in the past several years it has become increasingly clear that Facebook plans to expand its reaches into several other sectors, including the financial services sector.

8.      For example, as early as 2019, Facebook was publicly promoting new initiatives that had the explicit goal of enabling universal access to all types of financial services, including with Facebook's founder and CEO, Mark Zuckerberg, providing testimony to Congress on Facebook's plans for expansion into the financial services sector.

9.      Additionally, in 2020, Facebook created a new unit devoted to financial services—Facebook Financial.  Over the course of the past two years, this unit has increased in importance for Facebook, and changed from Facebook Financial to Novi to, most recently, Meta Financial Technologies.

10.     Indeed, as a sign of the importance Facebook places on its financial services business (and the value it places on using the "Meta" name in association with financial services), in December 2021 Facebook publicly confirmed that it paid $60 million to purportedly acquire the trademark rights of a regional bank named Meta Financial Group—rights junior to those of Metacapital.

11.     Facebook's use of the "Meta" mark in connection with financial services—and clear plans to continue and expand such use in connection with these and similar services—is likely to cause significant harm to Metacapital's business.

12.     Facebook, however, appears wholly unconcerned about how its actions might impact Metacapital, believing instead that it is entitled to introduce its "Meta" mark into any sector it chooses with impunity.  Given that Facebook was aware of Meta Financial Group

and its purported rights (which post-date Metacapital's priority by at least two years), it is not credible that Facebook was also not aware of Metacapital.

13.     Nonetheless, Facebook brazenly moved forward with its rebranding of its financial services unit with the "Meta" name, regardless of Metacapital's superior rights.

14.     Such actions are consistent with Facebook's larger attitude of giving little credence to the preexisting rights of other companies, and running roughshod over such rights.

15.     For example, since Facebook announced its name change, at least two other companies have filed trademark infringement suits against Facebook, alleging similar disregard for those companies' longstanding and superior rights.[1]  Facebook has also gone on the offensive against rightsholders that it views as standing in its way, seeking to cancel a decades-old trademark registration when that registration was cited against Facebook in its attempt to register its own marks.[2]

16.     Although Metacapital informed Facebook in May of this year that Facebook's actions were likely to cause confusion with Metacapital's business, Facebook dragged its feet and refused to make any meaningful efforts to avoid such confusion.

17.     In short, Facebook has shown a blatant disregard for Metacapital's rights, and its actions have already begun to deteriorate the goodwill that Metacapital has built in the METACAPITAL Marks and the META Mark for over two decades.  If Facebook's infringing activities are not enjoined, such actions will continue to cause significant confusion among consumers and irreparable harm to Metacapital.

---

[1] *See METAx LLC v. Meta Platforms, Inc.*, 1:22-cv-06125 (S.D.N.Y. 2022); *Dfinity Foundation v. Meta Platforms, Inc.*, 3:22-cv-02632-CRB (N.D. Cal. 2022).
[2] *See Meta Platforms, Inc. v. Metafile Information Systems, Inc.*, Cancellation No. 92081103 (T.T.A.B. 2022).

18.    Additionally, given Facebook's looming, near ubiquitous presence across various industries and sectors, including in the field of financial services, consumers are likely to believe, incorrectly, that Metacapital is associated with Facebook, or else is attempting to trade off of and infringe on Facebook's purported rights, causing further substantial harm to Metacapital.

## PARTIES

19.    Plaintiff Metacapital is an entity organized under the laws of Delaware, maintaining its principal place of business at 152 W. 57th St., 8th Floor, New York, NY 10019.

20.    Defendant Facebook is a Delaware Corporation, maintaining its principal place of business at 1601 Willow Road, Menlo Park, CA 94025.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over the Lanham Act claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1338(a). This Court has subject matter jurisdiction over the related state law claims raised in this action pursuant to 28 U.S.C. §§ 1338(b) and 1367.

22.    This Court has personal jurisdiction over Facebook because Facebook has transacted a substantial amount of business in this District, Facebook maintains a systematic presence in this District, and Facebook is registered to do business in the State of New York.

23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims asserted herein occurred in this District, and 28 U.S.C. § 1391(d).

## STATEMENT OF FACTS

### Metacapital's Background

24.     Metacapital was founded in 2001, and over the past two decades has established itself as an industry-leading investment advisory firm working in the mortgage and structured credit markets, including fixed income relative value trading, structured credit, directional rates trading, equities trading, and, most recently, carbon-related trading.

25.     Metacapital offers various services to its clients including investment management services, investment advisory services, asset management services, and investment strategy services.

26.     In addition, over the past two years Metacapital has been working to expand its service offerings to include exchange-traded funds, or ETFs.

27.     As a result of its outstanding performance, Metacapital has been repeatedly recognized in various rankings of the nation's top funds, including by Bloomberg Markets, Barron's, and BarclayHedge, and has received numerous Absolute Return Awards.

28.     Metacapital's clients include or have included both individuals as well as major financial institutions such as Citibank, Barclays, J.P. Morgan, Morgan Stanley, Wells Fargo, Bank of America, Goldman Sachs, Credit Suisse, and others.  Metacapital also works with various large global pension funds, family offices, insurance companies, and hedge funds.

29.     Over the last ten years, the value of investments managed by Metacapital has averaged over $6 billion annually.

30.     Metacapital has also received substantial unsolicited media attention, and has been featured on CNBC, Bloomberg TV, and Albourne TV.  In addition, Metacapital representatives have spoken at numerous industry conferences and panels, including those organized by SALT, Bloomberg, and ALTSV.

**The METACAPITAL Marks and the META Mark**

31.     Since its founding in 2001, Metacapital has continuously used the METACAPITAL Marks in connection with its financial services business.

32.     In February 2002, Metacapital applied for and subsequently obtained U.S. Trademark Registration No. 2,720,780 covering the mark METACAPTIAL MANAGEMENT for financial services, namely, investment advisory services, investment management services and asset management services (the "Metacapital Management Registration").  A copy of the Metacapital Management Registration is attached hereto as Exhibit A.

33.     Metacapital subsequently applied for and obtained U.S. Trademark Registrations covering the marks METACAPITAL (U.S. Trademark Registration No. 4,338,215; the "Metacapital Registration") and M METACAPITAL (U.S. Trademark Registration No. 4,338,621; the "M Metacapital Registration," and together with the Metacapital Management Registration and the Metacapital Registration, the "Registrations"), both for financial services, namely, investment advisory services, investment management services and asset management services.  A copy of the Metacapital Registration is attached hereto as Exhibit B and a copy of the M Metacapital Registration is attached hereto as Exhibit C.

34.     All of the Registrations are incontestable and based on a first use in commerce date of November, 2001.

35.     In addition, since its inception, Metacapital has routinely and continuously used the shorthand "Meta" to refer to itself and in connection with its services.  For example, Metacapital's employees frequently call the company "Meta" in communications with clients and potential clients, and refer to services—including fund names—using "Meta" rather than "Metacapital."

36.     Metacapital's customers and clients also have adopted this shorthand and regularly use the META Mark when describing, referring to, or promoting Metacapital's services.

37.     For example, Morgan Stanley, one of Metacapital's largest clients, internally referred to the Metacapital Rising Rates Fund as the "Meta Rising Rates Fund" and promoted this fund to its own retail clientele using the META mark.

38.     Additionally, Metacapital's clients will often introduce Metacapital to potential new clients using both the METACAPITAL Marks and the META Mark, and use the META mark when discussing Metacapital and its services (as well as the high quality of those services).  For example, in one communication a client encouraged a colleague to engage with Metacapital noting that "[i]n this day and age it is very difficult to find a differentiating uncorrelated strategy and Meta have been able to add value for us in several ways- worth time speaking to them."

39.     In short, over the past 20 years, Metacapital and its clients have routinely used both the METACAPITAL Marks and the META Mark interchangeably to refer to Metacapital and its services.

40.     Metacapital's use of the META Mark is arbitrary in connection with its financial services offerings.

41.     Metacapital has spent tens of millions of dollars in advertising, marketing, and promoting its services which are offered under the METACAPITAL Marks and the META Mark, including through its website (metacapital.com), via email and in-person communications with its clients and potential clients, at trade conferences and panels, and in industry publications.

42.     Both the METACAPITAL Marks and the META Mark have been consistently displayed to Metacapital's consumers since at least as early as 2001, both digitally and in the real world—including in marketing and pitch materials, social and mainstream media, direct communications with clients and potential clients, and the internet-at-large.

43.     Throughout its history, Metacapital has transacted at least $2 trillion in business while using the METACAPITAL Marks and the META Mark to refer to its services.

44.     As a result of the above extensive, continuous, and well-publicized uses, both the METACAPITAL Marks and the META Mark have come to be associated with Metacapital in the minds of consumers, and Metacapital has acquired strong trademark rights in the METACAPITAL Marks and the META Mark.  In addition, Metacapital has acquired secondary meaning in the META Mark.

**Defendant's Adoption of the Infringing Mark**

45.     On October 28, 2021—nearly twenty years after Metacapital first started using the METACAPITAL Marks and the META Mark—Facebook announced that it was changing its corporate name from Facebook, Inc. to Meta Platforms, Inc., and that it was rebranding itself as simply "Meta."

46.     In the days and weeks leading up to this announcement, Facebook had been teasing this rebranding in an effort to create buzz around its new name and image.

47.     Facebook made the announcement in connection with its Facebook Connect annual conference, thereby ensuring that it would receive as much media and consumer attention as possible.

48.     Along with adopting the brand name "Meta," Facebook has begun to use the word "meta" as a prefix for certain branded experiences and services it plans to introduce in

the future.  Facebook now uses the "Meta" name as an umbrella corporate trade name covering all of its goods and services, including in the financial services sector.

**Facebook's Unequivocal Plans to Expand into the**
**Financial Services Sector Using the META Mark**

49.    As part of this rebranding effort, Facebook has taken a number of deliberate, concerted steps to connect its new corporate name with services in the financial services industry—including services that directly overlap with those provided by Metacapital—thereby creating a likelihood of confusion between Metacapital and Facebook and causing significant harm to Metacapital, its METACAPITAL Marks and META Mark, and its goodwill.

50.    For example, on December 13, 2021, less than two months after the "Meta" name change announcement, Facebook publicly confirmed that it had spent $60 million to purportedly acquire the trademark assets of a U.S. regional bank named Meta Financial Group.[3]

51.    Included among these assets were a number of trademark registrations for "Meta" and "Meta"-formative marks covering financial services (the "Meta Financial Registrations"), including services that directly overlap with those covered by Metacapital's Registrations.  For example, one such registration covers the mark META for use with, *inter alia*, "investment advice and management services."[4]

52.    On information and belief, Meta Financial Group did not use any "Meta" or "Meta"-formative trademark prior to 2005, and the earliest priority date for any of the trademark registrations purportedly acquired by Facebook is June 15, 2004.  Accordingly, any

---

[3] *See* David French & Elizabeth Culliford, *Exclusive: Facebook owner is behind $60 mln deal for Meta name rights*, Reuters (December 13, 2021) *available at* https://www.reuters.com/business/media-telecom/exclusive-facebook-owner-is-behind-60-mln-deal-meta-name-rights-2021-12-13/.
[4] *See* U.S. Trademark Reg. No. 3,072,040.

rights that Facebook may have acquired post-date and are junior to Metacapital's priority in the METACAPITAL Marks and the META Mark.

53.      Additionally, Facebook did not acquire any of the physical assets of Meta Financial Group, but rather acquired only (i) company names and trade names including the word "Meta;" (ii) trademark registrations and common law rights for "Meta" and "Meta"-formative marks; (iii) "Meta" and "Meta"-formative domain names; and (iv) the goodwill associated with the foregoing.[5]  Accordingly, there is serious doubt that the purported acquisition was legally sufficient to grant Facebook any rights in the purported rights owned by Meta Financial Group.

54.      Thus, the Meta Financial Registrations are invalid and should be cancelled as they are junior to and conflict with Metacapital's superior rights, and to the extent the Meta Financial Registrations encompassed any valid rights, such rights have since been voided as a result of the legally insufficient transfer to Facebook.

55.      Nonetheless, Facebook's purported acquisition of the marks owned by Meta Financial Group demonstrates the minimum market value of "Meta" and "Meta"-formative marks in the financial services sector.  Further, Metacapital's METACAPITAL Marks and META Mark are more valuable than those Facebook attempted to acquire from Meta Financial Group, as they are senior to those marks.

56.      More concerningly, on January 4, 2022, Facebook filed two trademark applications with the U.S. Patent and Trademark Office for the marks META (U.S. Serial No. 97/202,620) and Design & META (U.S. Serial No. 97/202,641) covering a broad range of

---

[5] Meta Financial Group, Form 8-K (Dec. 13, 2021) *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0000907471/52079c8b-0b39-4a47-9618-ceb924bca466.pdf.

financial services including "investment management services" and "financial management, financial planning, financial forecasting, financial portfolio management and financial analysis and consultation" (the "Applications"). Copies of the Applications are attached hereto as Exhibit D.

57. Such services directly overlap with those offered by Metacapital under the METACAPITAL Marks and the META Mark, including the Registrations—which cover "investment advisory services, investment management services and asset management services"[6]—and Facebook's use of any "Meta" or "Meta"-formative mark in connection with its provision of those and other financial services set forth in the Applications is likely to cause confusion with Metacapital's existing rights.

58. The Applications were filed under Section 1(b) of the Lanham Act, indicating that Facebook is not yet using the trademarks in U.S. commerce in connection with such services but intends to do so in the future. In connection with such "intent to use" applications, Facebook, through its attorneys, was required to declare to the Patent and Trademark Office that it has a bona fide intention to use the mark in commerce as of the filing date in connection with all of the goods and services listed in the application.

59. Facebook's intentions to use the "Meta" name in association with the provision of financial services—and in particular investment management and financial planning services—is consistent with public statements made by the company, including by its CEO and founder Mark Zuckerberg, in recent years concerning Facebook's plans for the financial services sector.

---

[6] *See* Exhibits A-C.

12

60.     Most notably, in 2019, Facebook announced the Libra Association, a cryptocurrency initiative and financial infrastructure that was founded to, in the words of Mr. Zuckerberg, "give everyone access to financial tools."[7]

61.     In connection with the Libra Association, Facebook published a white paper that explicitly noted that one of the goals of the Libra Association was to create a blockchain "to serve as a solid foundation for financial services . . . which could meet the daily financial needs of billions of people," and that their "hope is to create more access to better, cheaper, and open financial services – no matter where you are, where you live, what you do, or how much you have."[8]

62.     Furthermore, according to the Libra (subsequently renamed "Diem") website, the overall "Vision" of the project was "[t]o enable universal access to financial services."[9]

63.     The Libra/Diem project was highly publicized by Facebook, with Mr. Zuckerberg even providing testimony to Congress regarding the project and Facebook's plans for how financial services might be provided by Facebook in the future.[10]  Additionally, over the course of the last three years, Facebook has provided numerous public updates on the status of the project, and repeatedly promoted it through its various platforms.

64.     At the beginning of this year, Facebook announced that while it was not continuing the Libra/Diem project, it will continue to explore virtual currencies and financial

---

[7] Mark Zuckerberg, Opening Statement to House Financial Services Committee (October 23, 2019), *available at* https://www.youtube.com/watch?v=x9jfzh4JyLg, 3:10-3:14.
[8] Libra Association Members, *An Introduction to Libra*, 5, 12 (July 23, 2019), *available at* https://sls.gmu.edu/pfrt/wp-content/uploads/sites/54/2020/02/LibraWhitePaper_en_US-Rev0723.pdf.
[9] Diem, *Vision*, https://www.diem.com/en-us/vision/ (last visited September 6, 2022).
[10] Mark Zuckerberg, Opening Statement to House Financial Services Committee (October 23, 2019), *available at* https://www.youtube.com/watch?v=x9jfzh4JyLg.

services in connection with its broader "Metaverse" project.[11]  Accordingly, consumers are likely to continue to encounter Facebook, and its newly-adopted "Meta" name, in the context of the provision of financial services in the future.

65.    Additionally, as noted, Facebook also announced earlier this year that it was changing the name of its financial services unit, originally called Facebook Financial and subsequently renamed Novi, to Meta Financial Technologies,[12] further demonstrating Facebook's intentions to continue associating its "Meta" name with the provision of financial services.

66.    Facebook also recently announced the rebranding of its "Facebook Pay" service offering to "Meta Pay," further increasing the likelihood of confusion between Metacapital and Facebook.  In connection with this announcement, Stephane Kasriel, Facebook's Head of Commerce and Financial Technologies, re-emphasized Facebook's mission to "empower everyone, everywhere to access the world's financial system to accelerate financial inclusion," and noted "the potential of the metaverse, and where it can take fintech next."[13]

**Facebook's Actions Threaten to Harm Metacapital**

67.    Facebook's use of the term "Meta," and in particular its purposeful and direct association of the "Meta" name with financial services—including services that directly overlap with those provided by Metacapital under its marks—will inevitably cause consumer confusion with the METACAPITAL Marks and the META Mark, and cause severe and

---

[11] Luc Olinga, *Facebook and Mark Zuckerberg Money Project in the Works*, TheStreet.com (Apr. 6, 2022), *available at* https://www.thestreet.com/technology/facebook-zuck-buck-metaverse.
[12] Owen Thomas, *Forget 'Zuck Bucks.' The real story is Facebook's financial identity crisis*, Protocol (Apr. 7, 2022) *available at* https://www.protocol.com/fintech/meta-financial-technology-novi-facebook.
[13] Aisha Malik, *Facebook Pay rebrands to Meta Pay as Zuckerberg details plans to create a digital wallet for the metaverse*, TechCrunch (June 23, 2022) *available at* https://techcrunch.com/2022/06/23/facebook-pay-rebrands-meta-pay-digital-wallet-metaverse/.

irreparable harm to Metacapital and the goodwill it has built up in the METACAPITAL Marks and the META Mark over the past twenty years.

68.     Moreover, because of the ubiquity and near-omnipresence of Facebook, there is a substantial likelihood that anyone encountering either the METACAPITAL Marks or the META Mark will believe, incorrectly, that Metacapital is the junior user, and that Metacapital is either affiliated or associated with Facebook, or is attempting to trade off of Facebook's brand and is infringing on Facebook's purported rights.

69.     Given Facebook's substantial resources, and its acquisition of purported trademark rights from Meta Financial Group, it is not credible that Facebook was not aware of Metacapital and its existing rights in the METACAPITAL Marks and the META Mark prior to Facebook's actions described above.

70.     Nonetheless, Facebook still moved forward with its plans to adopt the "Meta" name in connection with financial services, regardless of the consequences or harm caused to Metacapital and others.

71.     As a result of this infringing use, Metacapital sent a cease and desist letter to Facebook in May, 2022, asking Facebook to withdraw the Applications and confirm that it would not use the "Meta" mark or any confusingly similar mark in the financial services sector. However, the parties have been unable to resolve this dispute.

72.     Accordingly, Metacapital has been forced to file this suit to protect itself and its rights.  As a result of Facebook's infringing conduct, (i) Metacapital has lost significant value in its METACAPITAL Marks and the META Mark; (ii) Metacapital's goodwill and reputation have been irreparably damaged; and (iii) Metacapital can no longer present itself to its customers or the general public without being falsely associated with Facebook.

73.    Moreover, Facebook willfully disregarded Metacapital's prior rights and the harm to Metacapital's business that would be wrought by Facebook using a "Meta" or "Meta"-formative mark in connection with the provision of financial services.

## FIRST CLAIM
### (Trademark Infringement Under 15 U.S.C. § 1114)

74.    Metacapital incorporates by reference the allegations in the preceding paragraphs of the Complaint.

75.    Metacapital is the owner of the Registrations described in paragraphs 30 and 31 of this Complaint.

76.    Metacapital uses the marks associated with the Registrations in commerce in connection with the provision of financial services.

77.    Metacapital's marks as covered by the Registrations are incontestable, valid, and enforceable against third parties, including Facebook.

78.    Metacapital's marks as covered by the Registrations are arbitrary, or have acquired secondary meaning.

79.    Facebook has used and/or plans to use in interstate commerce trademarks that are confusingly similar to the marks covered by Metacapital's Registrations, in connection with the provision of financial services that are similar to those provided by Metacapital under the marks covered by its Registrations.

80.    Facebook's actions are likely to cause, have caused, and will continue to cause confusion, mistake, and deception in the minds of consumers as to the source or origin of Facebook's and/or Metacapital's services.

81.    Facebook acted with full knowledge that its actions would cause confusion or mistake and deceive consumers, which constitutes a willful violation of the Lanham Act.

82.    As a result of these actions, Metacapital has suffered irreparable injury and, unless Facebook's infringement is enjoined by the Court, Metacapital will continue to suffer irreparable harm.  There is no adequate remedy at law for the harm caused by Facebook's infringing conduct.

## SECOND CLAIM
### (False Designation of Origin Under 15 U.S.C. § 1125(a)(1)(a))

83.    Metacapital incorporates by reference the allegations in the preceding paragraphs of the Complaint.

84.    Metacapital has continuously used and currently uses the META Mark in commerce to identify itself and in connection with its business and services.

85.    By virtue of having used continuously and continuing to use the META Mark in commerce, Metacapital has acquired trademark rights in the META Mark, and the META Mark has come to be associated in the mind of relevant consumers with Metacapital.

86.    Facebook's use of marks that are confusingly similar to Metacapital's META Mark has caused and is likely to continue to cause confusion or mistake, or to deceive consumers and potential consumers, the public, and the trade concerning an affiliation, connection, or association between Facebook and Metacapital when there is no such affiliation, connection, or association.

87.    Facebook's activities constitute false designation of origin within the meaning of 15 U.S.C. § 1125(a).

88.    Facebook acted willfully, with full knowledge of Metacapital's prior rights in the META Mark, and Facebook's acts constitute a willful violation of the Lanham Act.

89.    As a result of these actions, Metacapital has suffered irreparable injury and, unless Facebook's infringement is enjoined by the Court, Metacapital will continue to suffer

irreparable harm.  There is no adequate remedy at law for the harm caused by Facebook's infringing conduct.

## THIRD CLAIM
### (Unfair Competition Under 15 U.S.C. § 1125(a)(1)(a))

90.     Metacapital incorporates by reference the allegations in the preceding paragraphs of the Complaint.

91.     By virtue of having used continuously and continuing to use the METACAPITAL Marks in commerce, Metacapital has acquired trademark rights in the METACAPITAL Marks.

92.     The METACAPITAL Marks are distinctive, and serve to identify Metacapital as the source of the services provided under the METACAPITAL Marks.

93.     Facebook has used and continues to use a trade name that is confusingly similar to the METACAPITAL Marks without Metacapital's consent.

94.     Facebook's unauthorized use in commerce of a trade name that is confusingly similar to the METACAPITAL Marks in connection with similar financial services is likely to cause confusion, mistake, and deception as to the origin, sponsorship, or approval of Metacapital's and/or Facebook's financial services.  .

95.     Facebook's activities, alleged herein, have a substantial economic effect on interstate commerce.

96.     Facebook's activities, alleged herein, constitute unfair competition within the meaning of 15 U.S.C. § 1125(a)(1)(a).

97.     Facebook acted willfully, with full knowledge of Metacapital's prior rights in the METACAPITAL Marks, and those acts constitute a willful violation of the Lanham Act.

18

98.     As a result of these actions, Metacapital has suffered irreparable injury and, unless Facebook's infringement is enjoined by the Court, Metacapital will continue to suffer irreparable harm.  There is no adequate remedy at law for the harm caused by Facebook's infringing conduct.

## FOURTH CLAIM
### (Common Law Trademark Infringement)

99.     Metacapital incorporates by reference the allegations in the preceding paragraphs of the Complaint.

100.     By virtue of having used continuously and continuing to use the METACAPITAL Marks and the META Mark in commerce, including in New York, Metacapital has acquired common law trademark rights in the METACAPITAL Marks and the META Mark.

101.     The METACAPITAL Marks and the META Mark are distinctive, and serve to identify Metacapital as the source of the services provided under the METACAPITAL Marks and the META Mark.

102.     Facebook's use of a trade name that is confusingly similar to the METACAPITAL Marks and the META Mark infringes Metacapital's common law trademark rights in the METACAPITAL Marks and the META Mark and is likely to cause confusion, mistake, or deception among consumers.

103.     By virtue of acts complained of herein, Facebook has intentionally caused a likelihood of confusion among the public and has unfairly competed with Metacapital in violation of the common law of the State of New York.

104.     As a direct and proximate result of Facebook's common law trademark infringement and unfair competition, Metacapital has suffered, and, unless Facebook is enjoined by this Court, will continue to suffer irreparable injury to Metacapital's business, reputation, and

goodwill in the METACAPITAL Marks and the META Mark for which Metacapital has no adequate remedy at law.

105. As a direct and proximate result of Facebook's common law trademark infringement and unfair competition, Metacapital has been forced to retain counsel to prosecute this claim and is entitled to recover its attorneys' fees and costs incurred herein.

## FIFTH CLAIM
### (Common Law Unfair Competition)

106. Metacapital incorporates by reference the allegations in the preceding paragraphs of the Complaint.

107. By virtue of having used continuously and continuing to use the METACAPITAL Marks and the META Mark in commerce, Metacapital has acquired trademark rights in the METACAPITAL Marks and the META Mark.

108. The METACAPITAL Marks and the META Mark are distinctive, and serve to identify Metacapital as the source of the services provided under the METACAPITAL Marks and the META Mark.

109. Facebook has used and continues to use a trade name that is confusingly similar to the METACAPITAL Marks and the META Mark without Metacapital's consent.

110. Facebook's unauthorized use in commerce of a trade name that is confusingly similar to the METACAPITAL Marks and the META Mark in connection with similar financial services constitutes unfair competition.

111. Facebook's activities, alleged herein, have a substantial economic effect on interstate commerce.

112. Facebook acted willfully, in bad faith, and with knowledge of Metacapital's prior rights in the METACAPITAL Marks and the META Mark.

113.    As a result of these actions, Metacapital has suffered irreparable injury and, unless Facebook's infringement is enjoined by the Court, Metacapital will continue to suffer irreparable harm.  There is no adequate remedy at law for the harm caused by Facebook's infringing conduct.

## PRAYER FOR RELIEF

WHEREFORE, Metacapital respectfully requests that this Court enter judgment in its favor on each and every claim set forth above and award it relief including, but not limited to an Order:

1.    Finding that: (i) Facebook has violated Section 32 of the Lanham Act (15 U.S.C. § 1114); (ii) Facebook has violated Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); (iii) Facebook has committed trademark infringement under New York common law; and (iv) Facebook has committed unfair competition under New York law;

2.    Entering an injunction enjoining and restraining Facebook from using in commerce or in connection with any goods or services any mark, name, or design that creates a likelihood of confusion with the METACAPITAL Marks or the META Mark; from pursuing registration of any mark, name, or design that creates a likelihood of confusion with the METACAPITAL Marks or the META Mark; and from engaging in any other acts of unfair competition;

3.    Awarding Metacapital all direct damages, indirect damages, consequential damages (including lost profits), special damages, costs, fees, and expenses incurred by reason of Facebook's wrongful acts, in an amount not less than $60 million;

4.    Awarding Metacapital treble damages sustained as a result of Facebook's willful and unlawful conduct, pursuant to 15 U.S.C. § 1117(a);

5.    Ordering an accounting by Facebook to Metacapital for any and all profits derived as a result of marketing, promoting, or selling any goods or services using any mark, name, or design that is confusingly similar to the METACAPITAL Marks or the META Mark;

6.    Awarding Metacapital actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit;

7.    Awarding Metacapital pre-judgment interest on any money awarded and made part of the judgment;

8.    Awarding Metacapital the maximum punitive and exemplary damages available under New York law;

9.    Awarding Metacapital its actual costs and attorneys' fees incurred in bringing and defending this action pursuant to 15 U.S.C. § 1117(a);

10.    Cancelling the Meta Financial Registrations pursuant to 15 U.S.C. § 1119; and

11.    Granting such other relief the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues properly triable of right by a jury.

Dated: December 20, 2022                Respectfully submitted,
New York, New York

_____
Anthony J. Dreyer

Anthony J. Dreyer
David M. Lamb
Michael C. Salik
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Tel.: (212) 735-3000
Fax: (212) 735-2000
anthony.dreyer@skadden.com
david.lamb@skadden.com
michael.salik@skadden.com

*Attorneys for Plaintiff Metacapital
Management, L.P.*

23